William F. FULTON

v.

PFIZER HOSPITAL PRODUCTS GROUP, INC., d/b/a Howmedica.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Oct. 20, 1993.

Permission to Appeal by Supreme Court Feb. 28, 1994.

Ken Burger, Murfreesboro, for appellee.

Glen Reid, Jr., McDonnell Boyd, Memphis, for appellant.

## OPINION

LEWIS, Judge.

This is an appeal by defendant Pfizer Hospital Products Group, Inc., d/b/a Howmedica, ("Howmedica") from the judgment of the trial court entered on the jury's verdict finding "that the defendant's product, [a medium plastic patella component,] was defective." The jury also found that the defendant breached "an implied warranty of fitness" and "an implied warranty of merchantability." The jury found that the product was not unreasonably dangerous.

Plaintiff William F. Fulton developed arthritis in both of his knees in approximately 1978. Because of the pain he decided to have total knee replacement of both knees. Plaintiff and his doctor, Richard Rogers, decided that since plaintiff's left knee caused more pain, surgery should be performed on his left knee first.

Dr. Rogers described the procedure as follows:

A. Yes. The term total knee replacement refers to an operation in which we replace all of the surfaces of the bone—the bones involved in the knee joint and that includes the—the thigh bone called the femur and the shin bone called the tibia and the kneecap which is called the patella. In the course of the operation we make cuts of the various bones so that a—a metal and plastic devices can be fitted on the bones.

Q. Uh-huh.

A. Then the thigh bone is capped much like a tooth would be capped with a metal component. The shin bone is cut flat and a piece—a metal piece is placed over that and cemented to it and a plastic liner is placed in that metal piece. And then the surface of the kneecap is cut flat, some anchoring holes are made within the kneecap and the plastic button is cemented into those holes.

Dr. Rogers performed the surgical procedure on the left knee on 24 January 1989 and on the right knee on 8 March 1989. Dr. Rogers chose to use the PCA Modular System manufactured by Howmedica for both surgeries. After the completion of both surgeries, plaintiff was examined by Dr. Rogers periodically until he was discharged in September 1989. Plaintiff had some fluid buildup in his knees which Dr. Rogers characterized as "somewhat unusual." The fluid buildup to the right knee cleared up, but there was always some fluid on the left knee.

### THE FACTS.

Plaintiff is sixty-one years of age and has resided in Rutherford County for some thirty years. Plaintiff worked at the Eaton Corporation in Shelbyville for the past twenty-one years. Plaintiff is a high school graduate and works a standard eight hour work day. His general health has been good, but he has suffered for many years with progressive deteriorating arthritis, primarily involving his knees.

Plaintiff consulted Dr. Richard Rogers, a Murfreesboro orthopaedic surgeon, in January 1989 because of severe arthritic problems he was having with both knees. Plaintiff had never experienced any type of trauma to either of his knees prior or subsequent to the implant of the prosthetic device.

Dr. Rogers performed the first surgical procedure on plaintiff's left knee on 24 January 1989. The surgery proceeded uneventfully and successfully. A second surgery was performed to replace the right knee on 19 March 1990. Plaintiff experienced immediate relief from the pain he had been having, but remained off the job for some five months convalescing.

Plaintiff followed Dr. Roger's instructions during his convalescence and engaged in no strenuous or vigorous activities. Plaintiff was released by Dr. Rogers from further follow-up treatment in September 1989. Following the surgery plaintiff engaged in no unusual or stressful activities. He experienced no unusual problems with either of his knees.

On 5 February 1990 plaintiff was walking up some steps and felt what he described as a "sting" in his left knee. Plaintiff saw Dr. Rogers the following day; he complained of a "prickly sensation in his knee." Dr. Rogers had x-rays taken of plaintiff's knee and instructed him to resume his rehabilitation exercises. Plaintiff returned to Dr. Rogers' office on 21 February 1990, at which time Dr. Rogers found "a large amount of fluid in the knee" and injected plaintiff with cortisone. On 7 March 1990 Dr. Rogers observed that the fluid had reaccumulated and stated that he could feel "a loose body" in the knee. Dr. Rogers stated he was not able to form an opinion regarding this object prior to surgery.

Dr. Rogers performed a second surgery on 19 March 1990, at which time the product manufactured by defendant was removed and replaced. Dr. Rogers found "that the three pegs that held the button into the kneecap were sheared off flush with the back of the button." These sheared pegs were part of the preconstructed patella device which came to Dr. Rogers from the manufacturer in its pre-built condition and required no construction, intervention, or involvement by Dr. Rogers, prior to his using it to replace plaintiff's knee. Dr. Rogers testified that he correctly installed the device and that he did not in any way damage the device on installing it. Dr. Rogers also testified that throughout his years of performing similar surgical procedures, he had never encountered a shearing or separation of the pins within the type of device manufactured by defendants. Dr. Rogers described the corrective procedures used on 19 March as follows:

There was some reactive tissue in the knee because of the irritation of what had happened and this tissue was removed. The polyethylene pegs that had been sheared off were still in the kneecap where they had been cemented and they were removed along with the cement that had been used to hold them there. Two of them were still seated in the kneecap. One was loose in the knee joint. This was located and removed from the knee. All of the cement was removed from the kneecap and then the kneecap was re-cut with a saw to again make it flush and a different kind of—of kneecap replacement was placed—cemented to it.

Plaintiff's recovery from the corrective surgery was uneventful, and he was subsequently discharged by Dr. Rogers. Plaintiff testified that he had not experienced further swelling or fluid in his knee, nor had he experienced any other problems. Plaintiff incurred $9,000 in medical expenses as a result of the replacement surgery on 19 March 1990 and had a loss of wages of some $4,200 during the period of convalescence which followed the 19 March 1990 procedure.

Dr. Rogers testified that he did not have an opinion as to what caused the product to fail. He was not able to determine by visual observation or by x-rays what had caused the pegs to shear. He agreed in his testimony that there are times in the field of orthopaedic surgery when a medical implant will fail, even when there is nothing wrong with the medical device. He explained that all medical implants have a "failure rate."

Plaintiff did not offer any proof nor did plaintiff contend that the failure rate for the particular medical device involved in this case was unacceptable. No proof was offered that the medical device was designed or manufactured improperly or that defendant violated some standard of care in the design or manufacture of the medical device.

We are cited to no evidence in the record, nor have we found any evidence that the product involved in this case was defective or unreasonably dangerous at the time it was sold by defendant. The jury specifically found that the product was not unreasonably dangerous.

■ The defendant's sole issue in this court is as follows: "In this products liability action involving a technically complex medical device, does mere evidence of a failure of the product constitute proof that the product was defective when it left the manufacturer's control?"

Defendant argues that "regardless of the theory arrived upon, in a products liability case in Tennessee, proof that the product was defective is an essential element." Tennessee Code Annotated § 29–28–105(a) (1980) sets forth this threshold requirement in a products liability case. "A manufacturer or seller of a product shall not be liable for any injury to person or property caused by the product *unless a product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.*" *Id.*

■ Plaintiff must prove that the product was defective, regardless of the legal theory upon which he relies.

Indeed, it makes no difference whether the complaint is couched in terms of negligence, strict liability or breach of warranty, it has generally been held in the State of Tennessee that in order for a plaintiff to recover under any theory of product liability, the plaintiff must establish that the product was defective and [1] unreasonably dangerous at the time the product left the control of the manufacturer. (citation omitted).

*Higgs v. General Motors Corp.,* 655 F.Supp. 22, 23 (E.D.Tenn.1985); *see also Browder v. Pedigrew,* 541 S.W.2d 402, 404 (Tenn.1976).

Tennessee Code Annotated § 29–28–102(2) (1980) defines defective condition as "a condi-

tion of a product that renders it unsafe for normal or anticipatable handling and consumption." Tennessee Code Annotated § 29–28–105(b) (1980) provides that in determining whether a product is defective "the state of scientific and technological knowledge available to the manufacturer ... at the time the product was placed on the market ... is applicable." Also consideration should be given "to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products." *Id.*

We find no proof in this record that the product was defective. Plaintiff offered no proof that defendant failed to employ or follow proper manufacturing procedures, or that the design of the product was deficient. No proof was offered that the product should have been made a different way or by using a different material. There is no evidence in the record that defendant deviated from acceptable standards of quality or conduct.

The only witness who testified and had an opportunity to examine or inspect the product was Dr. Rogers, and he offered no evidence or opinion that the product was in any way defective.

In fact he testified that he had "no opinion with which [he had] any certainty" as to what caused the failure of the implant. Dr. Rogers agreed in his testimony "that on occasion even when the surgeon does everything right and when there is nothing wrong with the devices, the medical implants, the devices can and do fail." He also testified that "implant medical devices have what's known.... as a failure rate."

■ As a general rule, an injury of itself is not proof of a defect and thereby raises no presumption of defectiveness. *Gates v. Ford Motor Co.,* 494 F.2d 458, 459 (10th Cir.1974); *Mullins v. Seaboard Coastline Ry. Co.,* 517 S.W.2d 198, 201 (Tenn.App.1974). The burden is upon the plaintiff to "show that there is something wrong with the product." *Tatum v. Cordis Corp.,* 758 F.Supp. 457, 461

---

1. Tennessee now favors a disjunctive interpretation of Tennessee Code Annotated § 29–28–105(a) so that a plaintiff may establish either that the product was defective or unreasonably dangerous at the time it left the control of the manu-

facturer or seller. *Smith v. Detroit Marine Engineering Corp.,* 712 S.W.2d 472, 474–75 (Tenn. App.1985). Restatement (2D) of Torts § 402A requires both defectiveness and unreasonably dangerous. (emphasis ours).

(M.D.Tenn.1991). A manufacturer is not an insurer of a product that is "accident proof, or incapable of causing injury." *Kerley v. Stanley Works,* 553 S.W.2d 80, 84 (Tenn.App. 1977).

Plaintiff contends that the "courts of this state have expressly approved the concept of proof of a product defect in a manner other than direct or expert testimony which would establish the exact nature and source of the defect in the product." Plaintiff relies on *Browder v. Pettigrew,* 541 S.W.2d 402 (Tenn. 1976) and insists that the theory approved by the court in *Browder* is identical to the theory upon which the plaintiff presented its case in the trial court.

*Browder* involved an automobile which went out of control following the collapse of a wheel support frame on the automobile. *Id.* at 403. The complaint in *Browder* expressly relied upon the doctrine of *res ipsa loquitur* in asserting claims based upon breach of implied warranty, strict liability, and negligence. *Id.*

Plaintiff here also relies upon the doctrine of *res ipsa loquitur.*

■ Generally, the doctrine of *res ipsa loquitur* has application only to the law of negligence and does not apply in a product's liability action based on breach of warranty. *Gallagher v. Pequot Spring Water Co.,* 2 Conn.Cir.Ct. 354, 199 A.2d 172, 176 (1963); *Gardner v. Coca–Cola Bottling Co.,* 267 Minn. 505, 127 N.W.2d 557, 564 (1964); *Hershenson v. Lake Champlain Mtrs. Inc.,* 139 Vt. 219, 424 A.2d 1075, 1078 (1981).

■ Under Tennessee law the doctrine of *res ipsa loquitur* is not a substitute for proof of defect. *Harwell v. American Medical Systems, Inc.,* 803 F.Supp. 1287, 1298 (M.D.Tenn.1992) (citing *Browder v. Pettigrew,* 541 S.W.2d 402, 404 (Tenn.1976).

■ Furthermore, under Tennessee law, to establish a defect in a product, the plaintiff must "trace the injury to some specific error in construction or design of the [product] ..." *Browder v. Pettigrew,* 541 S.W.2d at 404.

■ "Ordinarily *res ipsa* is not applicable to medical malpractice cases to afford proof of negligence." *Quinley v. Cocke,* 183 Tenn. 428, 437, 192 S.W.2d 992, 996 (1946). "This is true because neither lay people nor courts possess reliable common knowledge in such technical matters. Therefore, expert testimony regarding the standard of care or duty in order to show negligence is required." *German v. Nichopoulos,* 577 S.W.2d 197, 202 (Tenn.App.1978). Although this action is not in the nature of medical malpractice, the product in dispute is a technically complex medical device. Therefore, expert testimony is required, and Dr. Rogers offered no evidence or opinion that the product was defective.

In this case there is no showing that the plaintiff's injuries are traceable to any specific error in construction or design of the product. The plaintiff has failed to show that there was anything wrong with the product.

■ In order for the plaintiff to rely on the doctrine of *res ipsa loquitur,* the nature and circumstances of the accident must be of such character that there could be no reasonable inference but that the injury complained of was due to defendant's negligence or from the negligence of others for whose action the defendant is legally responsible. *Coca–Cola Bottling Works v. Sullivan,* 178 Tenn. 405, 417, 158 S.W.2d 721, 726 (1942). Here the plaintiff has failed to carry his burden in any of the theories put forth by him.

It results that the judgment of the trial court is reversed, and the case is dismissed at the cost of the plaintiff/appellee. The cause is remanded to the trial court for any further necessary proceedings.

CANTRELL and KOCH, JJ., concur.