IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 7, 2003 Session

## SUSAN TAYLOR v. SQUARE D COMPANY

**Appeal from the Circuit Court for Rutherford County**
**No. 43,748    Robert E. Corlew, III, Judge**

---

**No. M2002-01620-COA-R3-CV - Filed December 30, 2003**

---

Disobeying the direct orders of his supervisor, an electrician began work on a substation without following the proper safety procedures. He was electrocuted and perished almost instantly. The widow of the electrician brought suit against the manufacturer of the substation, alleging that the manufacturer was negligent and had defectively designed an unreasonably dangerous product. The trial court granted summary judgment for the manufacturer. Because there are no material factual disputes, and the negligence of the electrician was clearly greater than that of the manufacturer, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM CHARLES LEE, Sp. J., joined.

Robert L. Huskey, Manchester, Tennessee, for the appellant, Susan Taylor.

James H. London, Libba Bond, Lori M. Ritter, Knoxville, Tennessee; Jeffrey L. Reed, Murfreesboro, Tennessee, for the appellee, Square D Company.

### OPINION

Susan Taylor brought suit against Square D Company ("Square D") seeking damages for the death of her husband, Michael Taylor, which occurred at the Bosch Braking facility in Clarksville, Tennessee. Mr. Taylor, a journeyman electrician, was electrocuted while performing work on a substation. Mrs. Taylor alleged that the manufacturer, Square D, was negligent, or that the equipment it supplied was defective in design and unreasonably dangerous. Relying on several affidavits and depositions, Square D filed a motion for summary judgment, arguing that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law. After a hearing, the trial court granted summary judgment for Square D. Mrs. Taylor appeals.

## I. Undisputed Facts

The undisputed facts show the following: Mr. Taylor was employed by Amprite Electric Company as an electrician. Amprite was installing a new electrical service for the Bosch Braking facility which included a double-ended fed substation. The unit is divided into two portions, referred to as a top bus and a bottom bus. Each bus can work independently. In other words, the top portion can be energized without the bottom portion being energized. The top bus is accessed by a door; the bottom bus by a panel.

Over Labor Day weekend 1999, the manufacturing facility was shut down so that the existing service could be disconnected and the new service required by plant expansion, installed. On September 5, 1999, Mr. Taylor was working at the Bosch Braking facility when he was told by his supervisor, superintendent and general foreman David Vari, that the high voltage cables at the new penthouse in substation 6 needed to be terminated, or completely shut down and de-energized so that new equipment could be installed. Square D manufactured and assembled the switchgear in substation 6 that Mr. Taylor would be working on. The substation had 15 thousand volt conductors.

At the time Mr. Taylor and Mr. Vari walked to the substation, the substation was partially energized. Mr. Vari showed Mr. Taylor which wires needed to go on which feeds, and how it needed to be fed. The two then walked to the rear of the unit where the back cover had been removed, but the front covers of the switchgear were in place. There was yellow caution tape in the area behind the substation. Mr. Vari told Mr. Taylor that the top portion or upper bus of the unit was energized, the lower bus or portion of the unit was de-energized.

Mr. Vari then told Mr. Taylor that he was going to go get help to de-energize and lock out the switchgear.[1] Mr. Vari then left the area where the substation was located and walked toward the office when he heard an explosion. Mr. Vari returned to the substation where he found Mr. Taylor with his clothes on fire. The front cover of the switchgear was removed and Mr. Taylor's legs were inside the lower portion of the unit. Mr. Taylor died as a result of electrocution. Mr. Vari could think of no circumstance in which you would need to get into the unit while it was energized.

Attached to Mr. Vari's deposition were several accident reports and witness statements. The witness statement taken by the Montgomery County Sheriff's Department and the witness statement Mr. Vari completed for the Tennessee Department of Labor, Division of Occupational Safety and Health are consistent with the sequence of events that Mr. Vari described. A Supervisor's Accident Investigation Report of Personal Injury was completed by Mr. Vari for Amprite. It states:

---

[1] De-energizing and locking out the equipment are processes used to completely shut the equipment off and de-energize it. They include a procedure for testing the equipment to make sure that it is safe to work on. Every employee of Amprite is issued a tag with his or her picture on it for lock out purposes, and every employee has his or her own lock.

Mike [Mr. Taylor] proceeded to terminate 15 kv conductors after being instructed to wait for help and to lock-out the energized portion of the switch board. He removed the covered 15 kv switch and installed one conductor before shorting out the switch.

The statement indicates that the accident was the result of human error rather than fault in the equipment because "Mike failed to follow instructions, safety policy, safe work habits, and good judgment."

Brian Johnson, a field services representative for Square D, was performing start-up testing on 480 volt breakers in the low voltage switchgear in the same penthouse that day on a different substation. The equipment that Mr. Johnson was working on was not connected in any way to the equipment that Mr. Taylor was working on. He was working with his back to Mr. Taylor at a distance of about 15 to 20 feet when he heard the explosion. When Mr. Johnson turned around, he saw Mr. Taylor on his back with his clothing on fire. Mr. Johnson did not energize the substation that Mr. Taylor was working on, substation 6.

Mr. Lyle Lickiss, a senior staff engineer who investigated the accident for Square D, performed an inspection of the Square D equipment at the Bosch Braking facility on September 7, 1999. He inspected the high voltage interrupter switch on the substation that Mr. Taylor was working on at the time of the accident[2] and concluded that the switch was not defective or unreasonably dangerous. He opined that the switch should have been de-energized by Mr. Taylor prior to his working on the switch and that the switch was unrelated to the low voltage switchboard sections which Mr. Johnson was working on at the time of the accident. Mr. Lickiss did not generate a report about the accident because he stated that he was not asked by legal counsel for Square D to generate such a report. In Mr. Lickiss's opinion, "Mr. Taylor caused his own accident. It was his negligent actions of not obeying his foreman's instructions."

As an employee of Amprite, Mr. Taylor had received an Amprite Accident Prevention Program booklet. Subsection A of the booklet stated that employees were to "always de-energize circuits before working except when it's not practical as determined by the job supervisor (See lock out/tag out policy)." The booklet states that:

The purpose of this procedure [the lock out/tag out procedure] is to prevent unexpected energization, start-up, or release of stored energy in order to prevent injury. It is to be followed during servicing and maintenance of machines and equipment in which the "unexpected" start-up of the machine could occur.

The person working on such projects is responsible to see that the circuit is properly locked out. If an energy isolating device is capable of being locked out, then a lock

_____

[2] He was assisted in his inspection of the equipment by a field service technician for Square D and several Amprite electricians.

shall be used.  If it is not possible to use a lock, then the tag out system will be used. No one is to ever remove a tag other than the person who attached it.

The understanding of this procedure and the steps to follow could mean the difference between life and death.

The Accident Prevention Program booklet states the purpose of the lock out/tag out procedure as follows:

to establish the minimum requirements for the lockout of energy isolating devices whenever maintenance or servicing is done on machines or equipment.  It shall be used to ensure that the machine or equipment is stopped, isolated from all potentially hazardous energy sources and locked out before employees perform any servicing or maintenance where the unexpected energization or start-up of the machine or equipment or release of stored energy could cause injury.

The Accident Prevention Program booklet also requires all employees to

. . . comply with the restrictions and limitations imposed upon them during the use of lockout.  The authorized employees are required to perform the lockout in accordance with this procedure.  All employees, upon observing a machine or piece of equipment which is locked out to perform servicing or maintenance shall not attempt to start, energize, or use that machine or equipment.

The lock out/tag out procedure is also described in a step-by -step fashion in the Accident Prevention Program booklet.  Mr. Vari described the lock out/tag out procedure that should have been followed on the day Mr. Taylor was killed as follows:

We would have went up to the power house and opened the switches that fed Substation 5 and 6 and locked them out.  . . .we would went up there, opened them switches, locked them out, . . . which would have killed the power to the substation, locked them out and then got the high voltage gloves and the tester and tested it and grounded everything out.  Then once we seen that everything was grounded out and there was no electrical charge on there, we would then proceed work.

According to an Amprite Accident Prevention Program Warning Notice, Mr. Taylor was issued a warning on September 22, 1998 that he was "working on Section - 0 of MT53-1 machines, without lock out/tag out of equipment."  Mr. Taylor was disciplined and ordered to review the proper procedures. He received the infraction due to "negligence" and "potential harm to other employees." The technical record also contains sign-in sheets from "safety program" meetings held at Amprite that Mr. Taylor attended wherein lock out/tag out procedures, safety glasses, hard hats, body harnesses,  clean up, etc. were reviewed on multiple occasions.

There were several warning labels on the substation that Mr. Taylor was working on in the penthouse. The first, located on the bottom cover that was removed by Mr. Taylor stated, "Danger, hazard of electric shock or burn. Turn off power supply in this equipment before working on or inside." Two other warning labels stated, "Danger. High voltage. Keep out." and "Warning. Do not service switchgear unless all conductors have been grounded according to an accessible safety procedure." The warning labels were all easily visible and brightly colored.

## II. The Plaintiff's Expert

Mr. G.H. Redden, the expert for the plaintiff and the father-in-law of Mr. Taylor, filed three affidavits and gave deposition testimony in preparation for the trial court's decision on the motion for summary judgment. His affidavits note his extensive electrical engineering experience and the fact that he personally examined the penthouse and substation 6 and the equipment the day after the accident. While Mr. Redden had personally never designed a switch like the one Mr. Taylor was working on, he had worked with many of them over the course of his career. He felt that any general electrician, like Mr. Taylor, would be familiar with a lock out/tag out procedure and the necessity of performing such a procedure prior to commencing work on a piece of electrical equipment.

Mr. Redden felt that Mr. Vari's affidavit was contradictory, but had no concrete proof to dispute the sequence of events described by Mr. Vari. He felt that in order for Mr. Vari to tell Mr. Taylor how to feed the wires in the substation, it would have been necessary for the panels on the switching gear to be removed by Mr. Vari. After looking at the equipment he opined that "the cables are inside the enclosure, and there's steel sheet metal between - - that you can't see through" and he "thought the cover was on since it was energized. It would be stupid to have it off if it's energized. . . . I believe that one or both of them removed that cover, and I think that the cover was removed in the presence of, at least, David Vari and probably Mike, too, because you have to be able to remove the covers to see how it's connected." When asked what factual basis he had to support his opinion that the covers were removed in that fashion, he responded, "many years of experience that you don't have covers off of a 15 thousand volt switchgear exposed to hot live parts." He argued that Mr. Vari's testimony was that Mr. Taylor opened the panels to the switchgear after he left to go get help to lock out/tag out the unit.

Mr. Redden also disagreed with Mr. Johnson's statement that the two substations were completely isolated from each other. He asserted that the units were connected electrically, but again, had no concrete proof to rebut the testimony of Mr. Johnson.

Mr. Redden also contended that while the equipment was not defective, it was unreasonably dangerous. He felt there should have been some sort of insulating material or barrier between the upper and lower portions of the unit, such as a thin sheet of glastic,[3] which would serve as a barrier for about 89% of the area involved and could have saved Mr. Taylor's life. Mr. Redden admitted,

---

[3]The evidence shows that Square D used glastic, a thin polymer of glass and plastic, to prevent arcing between the blades which were located in the upper bus of the unit.

however, that even with the addition of the glastic between the upper and lower portions of the unit, arcing could still occur. Mr. Redden also suggested that the equipment should have been designed so that there was no way for it to be energized while the covers were removed. Mr. Redden also felt that the unit itself was dangerous in that there was no reason for anyone to be able to remove the panels while the unit was energized, and that this type of "dead-front panel" was available to Square D.

### III. Trial Court's Ruling

The trial court granted summary judgment for Square D. In dismissing Mrs. Taylor's lawsuit, the trial court found:

> We have examined the record, however, in detail, and continue to arrive at the unmistakable conclusion that a substantial amount of the fault associated with the death of Mr. Taylor unfortunately rests with the deceased. Realizing, of course, that Mr. Taylor is not available to present his version of the facts, the clear evidence from the surviving witnesses shows that Mr. Taylor was a very experienced electrician, and knew, or certainly should have known, of the dangers he faced when he entered a high voltage switching mechanism without following proper safety procedures. Based on Mr. Taylor's experience, it would appear that he knew, or should have known, that the proper safety procedures had not been followed. Further, the evidence is uncontroverted that Mr. Taylor was told in no uncertain terms that the safety procedures had not yet been followed, and thus he was instructed to wait until those safety procedures were followed, the unit was de-energized, and a helper was provided to him.
>
> The question before us, then, is whether as a matter of law an individual can be held to be less than fifty percent at fault where, in a light most favorable to the Plaintiff, the deceased was experienced, knew of the dangers, knew that the switch, or at least a portion thereof, was energized, knew that proper safety procedures required de-energizing the unit and a "lock out/tag out" procedure which was mandatory and which the employer was preparing to implement had not been accomplished, and where he was told not to enter the switch until it was de-energized, proper "lock out/tag out" procedures were followed, and a helper was provided to him. The employer, of course, is protected by the workers' compensation statutes, and fault cannot be assessed to the employer. The only other fault which could be apportioned is to the manufacturer of the switch. Again in a light most favorable to the Plaintiff, there is no evidence showing that the switch was defective or improperly manufactured. The only fault attributable to the manufacturer of the switch, again in a light most favorable to the Plaintiff, is through defective design. Whether the design was defective, and, in effect, whether the manufacturer should have designed the switch in a safer manner is a mixed question of law and fact. The amount of fault, if any, attributable to the manufacturer for the defective design, is also a matter

of fact to be determined by jury. Whether the total fault of the manufacturer, however, rises to the level of fifty percent of the total fault, is a question of law which the Court may determine on a motion for summary judgment. After consideration of all of the evidence, we have reached the conclusion that the fault of the manufacturer, as a matter of law, is considerably less than fifty percent.

In deciding this issue, we have taken the strongest legitimate view of the contested issues in favor of the Plaintiff and against the Defendant. We have considered, in accordance with the contentions of the Plaintiff, that David Vari removed panels on the switch as asserted by Gerald Redden and contrary to the contentions of Square D and the testimony of David Vari. We have considered, as the Plaintiff suggests, that Square D should have manufactured the switch with a safety device which would have sounded an alarm when the unit was energized and the panels were removed, but we find this to be of little significance, because it is uncontroverted that Mr. Taylor knew the unit was energized. We have further considered, as the Plaintiff contends, that Square D could have manufactured the switch so that it was de-energized when the panels were removed, but again find this design issue to be less significant when compared with the fact that Mr. Taylor was an experienced electrician, he knew the switch was energized, the switch bore more than one warning, Mr. Taylor had been specifically told not to work on the switch until it was de-energized and another electrician arrived to help, and lockout-tag out procedures were implemented. We have also considered that a shield could have been put in place between the top and bottom portions of the switch, again as the Plaintiff has suggested, but also recognize that the evidence shows that holes would have to be cut into such a shield to allow the switch to work properly, and arcing could still occur. We believe the proximate cause of the accident was the action of Mr. Taylor in performing work on a unit he knew was energized when he knew his work was in violation of the directions of his supervisor, generally accepted lock out/tag out procedures, the company safety policy, and warning labels on the switch itself.

Thus, tragic as the untimely death of Mr. Taylor is shown to be, we must reach the unmistakable conclusion that as a matter of law he was in fact responsible for more than fifty percent of the fault which resulted in his death, and thus the fault of Mr. Taylor must be attributed to the Plaintiff, and the Plaintiff cannot recover.

On appeal, Mrs. Taylor argues that the ultimate cause of Mr. Taylor's death was a defective design in the equipment upon which he was working and that his death could have been avoided by some simple design changes. She further argues that, based on the evidence available, a jury, not the trial judge deciding a motion for summary judgment, should determine whether or not the negligence of Mr. Taylor exceeded 50%. In response, Square D argues that the trial court was correct in granting summary judgment because the undisputed facts demonstrate that the switchgear on which Mr. Taylor was working was not defective or unreasonably dangerous. Square D also argues that the undisputed facts show that the negligence of Mr. Taylor in ignoring the proper safety

procedures, prominent warning signs, and explicit directions of his supervisor were the direct cause of his death.

## IV.  Defect in Design

According to Tennessee law, set forth in the Tennessee Products Liability Act, *see* Tenn. Code Ann. §§ 29-28-101 to -108, a manufacturer or seller of a product may be held liable for an injury caused by its product only if the "product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105; *Davis v. Komatsu America Industries Corp.*, 42 S.W.3d 34 (Tenn. 2001). A plaintiff must thus show either that a product is defective or that it is unreasonably dangerous.

A product is considered "unreasonably dangerous" if:

[the] product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8). A product is not unreasonably dangerous because of a failure to adequately warn of a danger or hazard that is apparent to the ordinary user. Tenn. Code Ann. § 29-28-105(d).

A "defective condition," on the other hand, is defined as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2). In interpreting and applying the definition of defective condition, courts have recognized that one factor to be considered is "consumer knowledge about the risks inherent in the use of (the) product." *Royson v. R.J. Reynolds Tobacco Co.*, 849 F.2d 230, 236 (6th Cir. 1988).

Further, the legislature has decided that in making the determination of whether a product is defective or unreasonably dangerous,

the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.

Tenn. Code Ann. § 29-28-105(b). In order to establish a defect in a product, the plaintiff must "trace the injury to some specific error in construction or design of the [product] . . . ." *Fulton v. Pfizer Hosp. Prods. Group, Inc.*, 872 S.W.2d 908, 912 (Tenn. Ct. App. 1993) (quoting *Browder v. Pettigrew*, 541 S.W.2d 402, 404 (Tenn. 1976)).

The actual design of the product does not have to be perfect, accident proof, or incapable of causing injury to be considered non-defective. *See, e.g., Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1430 (E.D. Tenn. 1991) (holding "where it is simply shown that there is a better, safer, or different design which would have averted the injury, this does not establish that there has been a departure from the required standard of care"); *Fulton*, 872 S.W.2d at 912 (stating that a "manufacturer is not an insurer of a product that is accident proof, or incapable of causing injury"); *Bishop v. Smith & Nephew Richards, Inc.*, No. 02A01-9405-CV-00108, 1995 WL 99222, at *9 (Tenn. Ct. App. Mar. 10, 1995) (no Tenn. R. App. P. 11 application filed) (finding that a manufacturer is "not required to design a perfect or accident-proof product"); *Gerdts v. Nelson*, No. 03S01-9405-CV-00190, 1995 WL 146232, at *3 (Tenn. Ct. App. Apr. 4, 1995) (no Tenn. R. App. P. 11 application filed).

This theory stems from *Kerley v. Stanley Works*, 553 S.W.2d 80, 84 (Tenn. Ct. App. 1977), wherein this court quoted the following from 72 C.J.S. PRODUCTS LIABILITY § 21:

> A manufacturer, . . . is not an insurer of the product he designs, and it is not required that the design adopted be perfect, or render the product accident proof, or incapable of causing injury, nor is it necessary to incorporate the ultimate safety features in the product. Hence, a departure from the required standard of care is not demonstrated where it is simply shown that there was a better, safer, or different design which would have averted the injury.

In *Kerley*, the widow of a deceased subcontractor sued the manufacturer of an electric power drill for the wrongful death of her husband, relying on the theories of strict liability and negligent design. Mr. Kerley, the deceased, had purchased the drill and used it regularly in his work as a subcontractor. After using the drill for about a year, it started malfunctioning. Mr. Kerley made repairs on the drill and it appeared to be functioning normally until he took the drill up a twenty foot ladder to drill holes in a metal plate on an overhead door. Mr. Kerley was electrocuted and fell from the ladder, striking his head on the concrete floor where he died immediately. Mrs. Kerley argued that the housing and the component parts of the drill were negligently designed, which resulted in her husband's death. Although Mrs. Kerley offered expert witnesses who testified that the wiring in the drill was damaged after being caught between the handle and the housing of the drill when Mr. Kerley was reassembling it after repairs, neither witness could express an opinion as to any defect in the design of the drill which would make it inherently dangerous to the user. Quoting the above language from C.J.S., this court affirmed the trial court's grant of a directed verdict for the drill manufacturer.

Thus, it is not enough for Mrs. Taylor to show that a better, safer, or different design to the substation would have prevented her husband's death; she must actually show that the product was unsafe for normal or anticipatable handling. "The burden is on the plaintiff to 'show that there is something wrong with the product.'" *Fulton*, 872 S.W.2d at 911-12 (quoting *Tatum v. Cordis Corp.*, 758 F. Supp. 457, 461 (M.D. Tenn. 1991)). There was no evidence introduced in the trial court that Square D failed to follow national safety standards for medium voltage equipment in designing the

substation on which Mr. Taylor was working. To the contrary, the only expert testimony offered, by Mr. Redden, confirmed that Square D had followed safety standards in designing the substation. Mr. Redden could only offer his opinions on how the product could have been made safer by the addition of dead front panels or glastic; he offered no proof of how the equipment, as it was on the date of Mr. Taylor's death, was defective or unreasonably dangerous. Further, there is no evidence that the product was malfunctioning in any way. Consequently, we conclude that the plaintiff has failed to establish the necessary elements to sustain a cause of action for defective design.

Even if Ms. Taylor had sufficiently established a claim to survive summary judgment on the issue of Square D's negligence, however, Square D was nonetheless entitled to summary judgment for the other reason stated by the trial court.

## V. Comparative Negligence

After Tennessee's adoption of comparative fault in *McIntyre v. Ballentine*, 833 S.W.2d 52 (Tenn. 1992), where both the plaintiff and the defendant engaged in negligent conduct that proximately caused the injuries complained of, the plaintiff cannot recover if his or her fault is equal to or greater than the fault attributable to the defendant. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994). In *Eaton*, the Tennessee Supreme Court established or clarified the circumstance under which a trial court can determine, as a matter of law, that the plaintiff's fault is equal to or greater than the defendant's. The trial court is to take the strongest legitimate view of the evidence in favor of the plaintiff and grant the defendant dismissal only if reasonable minds could not differ as to the legal conclusions to be drawn from that evidence. *Id*. at 590. Further,

> [i]n summary, the percentage of fault assigned to each party should be dependent upon all the circumstances of the case, including such factors as: (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Id.* at 592. Thus, "[i]f the court determines that all reasonable jurors would find the plaintiff's fault was fifty percent or more, it must grant summary judgment because when the plaintiff's fault is fifty percent or more he or she can not recover and there is nothing for the jury to decide." *Carr v. Ozburn-Hessey Storage Co.*, No. 01-A-01-9511-CV-00527, 1996 WL 383295, at *2 (Tenn. Ct. App. Jul. 10, 1996) (no Tenn. R. App. P. 11 application filed).

Summary judgments enable courts to resolve cases on dispositive legal issues. Summary judgment is proper in virtually any civil case that can be resolved on the basis of legal issues alone.

*Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Church v. Perales*, 39 S.W.3d 149, 156 (Tenn. Ct. App. 2000). But, summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion - that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Goodloe v. State*, 36 S.W.3d 62, 65 (Tenn. 2001); *Staples v. CBL & Associates*, 15 S.W.3d 83, 88 (Tenn. 2000).

Summary judgments enjoy no presumption of correctness on appeal. *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 284 (Tenn. 2001); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Staples*, 15 S.W.3d at 88; *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). Then, we, like the trial court, must review the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, here Ms. Taylor, afford all reasonable inferences to that party, and discard all countervailing evidence. *Bradshaw v. Daniel*, 854 S.W.2d 865, 870 (Tenn. 1993); *Byrd*, 847 S.W.2d at 210-11.

There is no real factual dispute about how the accident herein happened. The undisputed facts show that Mr. Taylor, an experienced electrician, trained multiple times in the proper safety procedures, disobeyed the orders of his supervisor by choosing not to wait for assistance in the lock out/tag out of the substation. The equipment carried a warning sign. There is no dispute that if the substation had been locked out/tagged out or de-energized Mr. Taylor would not have been electrocuted. There is no allegation that anything in the design of the equipment would have prevented this simple routine safety precaution. Mr. Taylor's own decision to commence work without following the safety procedures led to his death. While we certainly acknowledge the tragedy of the situation, there is no escaping the fact that the evidence clearly demonstrates that reasonable minds could not differ as to the legal conclusions that must be drawn from the evidence. The trial court properly granted summary judgment for Square D because Mr. Taylor's negligence was clearly greater than any negligence on the part of Square D. The judgment of the trial court is affirmed and remanded. The costs of this appeal are taxed to the appellant, Susan Taylor.

_____
PATRICIA J. COTTRELL, JUDGE

-11-