Elisabeth **EBERLI**, Plaintiff,

v.

**CIRRUS DESIGN CORPORATION et al.,** Defendants.

**Case No. 08–60273–CIV.**

United States District Court, S.D. Florida.

May 19, 2009.

Ricardo M. Martinez–Cid, Steven Craig Marks, Aaron Samuel Podhurst, Carolina Maharbiz, Podhurst Orseck Josefsberg et al, Miami, FL, for Plaintiff.

Arnoldo B. Lacayo, Edward Maurice Mullins, Jose I. Astigarraga, Chalon Tamara Allen, Astigarraga Davis Mullins & Grossman, Miami, FL, Courtney Bateman, Reed Smith, Washington, DC, Patrick E. Bradley, Patrick E. Bradley, Reed Smith LLP, Princeton Forrestal Village, Princeton, NJ, for Cirrus Design Corporation.

Amy E. Furness, Benjamine Reid, Carlton Fields, Miami, FL, for Teledyne Continental Motors, Inc.

### ORDER ON MOTION TO PRECLUDE AND/OR LIMIT TESTIMONY

URSULA UNGARO, District Judge.

THIS CAUSE is before the Court upon the Motion to Preclude and/or Limit Testimony of Plaintiff's Experts Donald Sommer and Arthur Lee Coffman and Cirrus's Expert David Klepacki ("Def.'s Mot."), filed by Defendant Teledyne Continental Motors, Inc. ("Teledyne") on April 24, 2009. (D.E. 101.) Defendant Cirrus Design Corporation ("Cirrus") filed its Response in opposition ("Def.'s Resp.") on May 11, 2009. (D.E. 121.) Plaintiff filed her Response in opposition ("Pl.'s Resp.") on May 11, 2009. (D.E. 124.)

THE COURT has considered the Motion and the pertinent portions of the record and is otherwise fully advised in the premises.

By way of background, this action arises out of Plaintiff's husband's death while piloting a Cirrus SR 20 aircraft after it crashed into the Atlantic Ocean near the coast of Greenland. In its Amended Complaint, Plaintiff brings negligence and strict liability claims against the airplane

manufacturer, Cirrus, and the engine manufacturer, Teledyne. In its Motion, Defendant Teledyne moves to exclude certain opinions offered by expert witnesses for both Plaintiff and Defendant Cirrus on the basis that they are inadmissible under Rule 702 and/or Rule 403 of the Federal Rules of Evidence.

## LEGAL STANDARD

The admissibility of expert testimony at trial is governed by Rule 702 of the Federal Rules of Evidence, which states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. The Supreme Court set forth the criteria for the admissibility of scientific expert testimony under Rule 702 in *Daubert* by instructing trial judges to "determine at the outset, pursuant to Rule 104(a),[1] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue," which includes "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and or whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Kumho Tire*, the Supreme Court subsequently held this standard to be applicable to all expert testimony, holding that "*Dau-*

*bert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ In *Rink v. Cheminova, Inc.*, the Eleventh Circuit Court of Appeals established a three-part test to determine whether expert testimony should be admitted under *Daubert*, explaining that all of the following elements must be established prior to the presentation of expert testimony to the jury:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

400 F.3d 1286, 1291–92 (11th Cir.2005). The party seeking to introduce the expert witness bears the burden of satisfying these criteria. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (holding that the "burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence").

With respect to the qualification of an expert, the Eleventh Circuit has recog-

---

1. Rule 104(a) provides: "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court. . . . In making its determination it is not bound by the rules of evidence except those with respect to privileges."

nized that "[w]hile scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir.2004). To determine whether a witness is qualified to testify as an expert regarding the matters he intends to address, the Eleventh Circuit and other courts of appeal have held that a witness who possesses general knowledge of a subject may qualify as an expert despite lacking specialized training or experience, so long as his testimony would likely assist a trier of fact. *See United States v. Hensel*, 711 F.2d 1000, 1006 (11th Cir.1983) (holding that the trial court did not err in allowing a witness with an extensive background in arson investigation to testify as an expert in a case involving a shipboard fire even though the majority of his experience concerned fires on land); *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir.2001) (finding—in a civil RICO claim involving fraudulent real estate transactions—that a witness with "a Ph.D. in economics from Yale, extensive experience as a professional economist, and a substantial background in estimating damages" was qualified as an expert witness in assessing the loss suffered by the plaintiff even though he had no real estate development experience); *Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454, 457–58 (5th Cir.1996) (finding that broad, general experience in the insurance industry was sufficient to a qualify witness as an expert even though the witness had no experience working with insurance consultant or London broker); *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 551 (7th Cir.1980) (concluding that, in an action alleging damage from coal mine blasting, a geologist with little actual experience studying blasts from coal mining operations was qualified to testify as an expert);

*see also* Fed.R.Evid. 702 advisory committee's note (2000 amends.) (explaining that "[n]othing in [the 2000] amendment [was] intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony").

■ Even if a witness is qualified as an expert regarding a particular issue, the process used by the witness in forming his expert opinion must be sufficiently reliable under *Daubert* and its progeny. *See Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir.2003) (stating that "one may be considered an expert but still offer unreliable testimony"); *cf. McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir.2002) (holding that "[r]ulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology"). The Eleventh Circuit in *Frazier* quoted the advisory committee's note to the 2000 amendments of Rule 702, which explains that "[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Frazier*, 387 F.3d at 1261 (quoting Fed.R.Evid. 702 advisory committee's note (2000 amends.)). Thus, the *Frazier* court observed, "it remains a basic foundation for admissibility that "[p]roposed [expert] testimony must be supported by appropriate validation— *i.e.*, 'good grounds,' based on what is known.'" *Id.* (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786).

■ The trial court may consider the factors set forth in *Daubert* for testing

whether an expert's methodology is sufficiently reliable to allow his testimony to be presented to the jury; [2] however, the court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." [3] *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167; *see also Rink,* 400 F.3d at 1292; *Frazier,* 387 F.3d at 1262 ("In certain cases, it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable."). The "objective of *Daubert*'s gatekeeping requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167.

The final requirement for admissibility of expert testimony is that it "assist the trier of fact." *Frazier,* 387 F.3d at 1244. In other words, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Id.* (citing *United States v. Rouco,* 765 F.2d 983, 995 (11th Cir. 1985)). Expert testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Retirement Sys.,* 50 F.3d 908, 917 (11th Cir. 1995) (citations omitted).

## ANALYSIS

### Defendant Cirrus's Expert David Klepacki

Even assuming, without deciding, that Mr. Klepacki is qualified as an expert regarding the matters he intends to address, the process he used in forming his expert opinion must be sufficiently reliable under *Daubert* and its progeny. *See Quiet Tech. DC-8, Inc.,* 326 F.3d at 1342 (stating that "one may be considered an expert but still offer unreliable testimony"); *cf. McCorvey,* 298 F.3d at 1257 (holding that "[r]ulings on

2. The *Daubert* Court listed the following non-exclusive factors that courts may take into consideration when determining whether the expert's reasoning or methodology is reliable: (1) whether the methodology can be tested; (2) whether the methodology has been subjected to peer review and publication; (3) the known or potential rate of error; (4) general acceptance. 509 U.S. at 593–94, 113 S.Ct. 2786. The *Daubert* Court emphasized that the inquiry is "a flexible one." *Id.* at 594, 113 S.Ct. 2786.

3. The advisory committee's note to Rule 702 lists additional factors the court may consider:

 (1) Whether the expert is proposing to testify about matters growing naturally and di-

rectly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying; (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) Whether the expert has adequately accounted for obvious alternative explanations; (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology"). The Court must also find that the testimony would assist the trier of fact to understand the evidence or to determine a fact at issue. *See Rink,* 400 F.3d at 1291–92. Defendant Teledyne seeks to exclude two opinions proffered by Mr. Klepacki: (1) that the engine failure was not caused by a frozen breather line and (2) that there were four likely causes of the engine failure. The Court shall consider each of these opinions in turn.

▬ Defendant Teledyne first argues that Mr. Klepacki's opinion that the engine failure was not caused by a frozen breather line is inadmissible because it would not assist the trier of fact. (Def.'s Mot. 17–19.) Defendant essentially contends that because Mr. Klepacki formed this opinion based solely on the flight testing done by another expert, Dr. Butler, Mr. Klepacki's testimony regarding this opinion is not based on any specialized, technical, or scientific knowledge or methodology and would not assist the trier of fact because it merely parrots another expert's opinion. (Def.'s Mot. 18–19.) The Court agrees. While it is true that "an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts," *Ohio Environmental Development Ltd. Partnership v. Envirotest Systems Corp.,* 478 F.Supp.2d 963, 976 (N.D.Ohio 2007) (internal quotations and citation omitted), such expert must make some findings and not merely regurgitate another expert's opinion. *See Robinson v. Ford Motor Co.,* 967 F.Supp. 482, 487 n. 2 (M.D.Ala.1997).

Defendant Cirrus contends that Mr. Klepacki based his opinion on (1) Dr. Butler's flight test, (2) his comparison of the subject incident to three prior incidents involving breather line freeze-ups, and (3) the fact that two sister aircraft traveling near the subject aircraft did not experience any problems. (Def.'s Resp. 5.) However, Mr. Klepacki's deposition testimony makes clear that he bases the opinion in question solely on the flight test conducted by Dr. Butler. *See* Klepacki Dep. 166:2–7 ("Q: So really the opinion that this accident was not caused by a frozen crankcase breather is not based on the fact that three others froze in a different way, it's based only really on the flight testing that Dr. Butler did, correct? A: That's correct."); *see also* Klepacki Dep. 169:2–11 ("Q: The information you have is so incomplete as to what the other two pilots did that you really can't draw any good conclusions from it. Isn't that correct? A: Only the conclusion that they did not experience, they didn't report any breather freezing problems. Q: But that doesn't mean that Mr. Schoder didn't encounter those freezing problems, correct? A: I guess that's correct.").

Additionally, Mr. Klepacki's deposition testimony demonstrates that the opinion based on Dr. Butler's flight testing—essentially, that the flight testing supports the conclusion that the breather line did not freeze (*see* D.E. 104–5 at 8)—is Dr. Butler's, rather than Mr. Klepacki's, opinion. *See* Klepacki Dep. 171:23–172:1 ("All of these are opinions of both of us, but the one that we just talked about, as far as the flight test conclusions, number 2, would be more Dr. Butler.")[4] The Court fails to see how Mr. Klepacki's opinion that the

---

**4.** The Court also finds the following exchange instructive:

Q: The second opinion about flight testing of the SR20, that would be for me to discuss with Dr. Butler, correct?

breather line did not freeze would assist the trier of fact, given that Dr. Butler made the flight test conclusions and Mr. Klepacki admitted that the flight test conclusions were the sole basis for his conclusion that the breather line did not freeze. In this instance, it appears that Mr. Klepacki made no findings regarding the breather line; instead, it appears that he simply adopted Dr. Butler's conclusions regarding the flight tests. Such a methodology surely does not satisfy the *Daubert* standards. Thus, Mr. Klepacki will be precluded from testifying regarding the conclusion that the breather line did not freeze; Dr. Butler, however, will be permitted to testify regarding this conclusion.

▆ Next, Defendant Teledyne contends that Mr. Klepacki's opinions regarding alleged engine failure are inadmissible because they are too speculative. (Def.'s Mot. 19–20.) The Court agrees. " 'Under the regime of *Daubert* ... a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.' " *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1316–17 (11th Cir. 1999) (quoting *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996)). Having reviewed Mr. Klepacki's testimony explaining his conclusions regarding the most likely causes of engine failure, the Court finds that such conclusions are exactly the sort of unscientific speculation that *Daubert* was designed to exclude. Mr. Klepacki does not appear to have utilized any specific technique or methodology, as required by *Daubert*, nor done any testing to form this opinion; instead, Mr. Klepacki appears to have looked at the known facts regarding the crash and theorized based on his knowledge of accidents and airplanes.[5] The fact that the opinion itself merely lists potential causes instead of drawing any conclusion underscores just how speculative it is: "More likely causes of the engine failure are related to components of the oil delivery system, components of the cylinder assembly, cracked crankcase or an oil leak in general, etc." As such, the Court finds that Mr. Klepacki's opinion regarding the more likely causes of engine failure should be excluded.

*Plaintiff's Expert Donald Sommer*

Even assuming, without deciding, that Mr. Sommer is qualified to testify as an expert on piloting and accident reconstruction, including engine failure analysis, the Court must still find that the process he used in forming his expert opinion is suffi-

A: That's correct.
Q: That's not your opinion in this case, correct, that's his? You didn't do the flight testing. You didn't do the thermal computation. So this is going to be his opinion, correct?
A: That's correct.
(Klepacki Dep. 169:12–20.)

5. In fact, as Defendant Teledyne points out, several of the possibilities Mr. Klepacki mentions in his opinion are not supported by the evidence. (*See, e.g.,* Klepacki Dep. 190:1–6 ("Q: I am trying to make sure I understand your opinion and that indeed the failure of the oil delivery system does not seem to mirror the symptoms that Mr. Schoder reported to the other pilots. Would you agree with that? A: That's correct."); *see also* Klepacki Dep. 195:21–196:7 ("Q: If Mr. Schoder experienced cylinder assembly failure, would you expect to see him describing the engine operation as rough? A: Yes, you could. I mean, yes, you could have that. Q: Do you know ... if in that report Mr. Schoder ever reported that his engine was operating in any capacity other than normal? A: I don't recall if talking about that it was running rough....").)

ciently reliable under *Daubert* and its progeny. *See Quiet Tech. DC–8, Inc.*, 326 F.3d at 1342 (stating that "one may be considered an expert but still offer unreliable testimony"); *cf. McCorvey*, 298 F.3d at 1257 (holding that "[r]ulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology"). The Court must also find that the testimony would assist the trier of fact to understand the evidence or to determine a fact at issue. *See Rink*, 400 F.3d at 1291–92. Defendant Teledyne seeks to exclude three opinions proffered by Mr. Sommer: (1) that the breather line connection should have been located in a different place; (2) that Defendant Teledyne should have advised Defendant Cirrus to insulate the breather line at the time they audited the engine installation; and (3) that another "potential possibility" for the crash is that there was an expulsion of oil from the engine. (Def.'s Mot. 3.) The Court shall consider each of these opinions in turn.

 Defendant Teledyne first argues that Mr. Sommer's opinion that the breather line connection should have been located in a different place [6] is inadmissible because it is not based upon a sufficiently reliable foundation. (Def.'s Mot. 7.) Ac-

cording to Defendant Teledyne, in coming to this opinion, Mr. Sommer did not conduct any testing, and he neither had any factual basis that another location would better nor determined how the design change would be accomplished. (Def.'s Mot. 7.) Plaintiff responds that Mr. Sommer's opinion is admissible even in the absence of testing because Mr. Sommer's proposed alternative design already exists.

Although the Court agrees that Mr. Sommer need not determine how his proposed design change would be accomplished, given that such alternative design already exists in the marketplace, in order for his testimony to be admissible, Mr. Sommer's opinion must still be based upon a reliable methodology or technique. Here, it appears that Mr. Sommer did not utilize any methodology in forming the opinion in question; instead, he merely concluded, without any testing or comparison of engines, that the breather line should have been located in the rear of the engine because its current location subjects it to cold airflow and because other engines have breather lines in the rear. (*See generally* Sommer Dep. 199:16–209:23.) [7] Mr. Sommer's "why not?" reasoning model cannot truly be considered a methodology at all, for it does not consist of steps or a process.[8] In fact, his analysis

---

6. In her Response, Plaintiff discusses Mr. Sommer's statement that the breather outlet's location on the front of the engine directly exposes the breather line to cold air coming from the inlet. As Defendant Teledyne has not challenged this apparently factual statement, which appears to form part of the basis for the opinion in question, the Court shall not consider its admissibility.

7. In his testimony, Mr. Sommer explains that he concluded that the breather line should have been located in the back of the engine because it is possible for it to be located in the back of the engine, given the fact that it is located there in Defendant Teledyne's IO–550

engine, and because "I can't think of a reason in the world why it can't be located in the back of the engine where it belongs and where it's not subjected to the elements." (*See* Sommer Dep. 199:19–24.) Mr. Sommer went on to concede that breather lines are located in a variety of locations on different engines. (*See* Sommer Dep. 206:13–14 ("There are some that have the breather in the front, some in the back and some in the middle.").)

8. *Humphrey v. Diamant Boart, Inc.*, 556 F.Supp.2d 167 (E.D.N.Y.2008), upon which Plaintiff relies, is distinguishable, for the challenged expert in that case utilized an identifi-

does not even explore whether the engine's functioning would be affected by changing the location of the breather line or whether locating the breather line in the rear of the engine would sufficiently protect it from freezing temperatures; he just assumes. As such, the Court finds that Mr. Sommer's opinion that the breather line should have been located in the rear of the engine is not based upon a sufficiently reliable methodology and must be excluded.

■ Defendant Teledyne next argues that Mr. Sommer's opinion that Defendant Teledyne should have advised Defendant Cirrus to insulate the breather line during the installation audit is inadmissible. (Def.'s Mot. 8–10.) The Court agrees. To begin with, this opinion, while it may be supported by the facts on the record, cannot be said to be the product of any sort of methodology, even if it "logically follows from the documents themselves." (*See* Pl.'s Resp. 7.) Much like Mr. Sommer's opinion regarding the breather line placement, this opinion was not formulated through a series of steps or a process. Further, the Court cannot conclude that the opinion in question would assist the trier of fact, as it is a conclusion at which jurors could arrive on their own and requires no scientific or specialized knowledge. *See Hibiscus Assocs.*, 50 F.3d at 917. As such, the Court finds that Mr. Sommer's opinion that Defendant Teledyne should have advised Defendant Cirrus to insulate the breather line during the installation audit is excluded.

■ Finally, Defendant Teledyne contends that Mr. Sommer's opinion that a malfunction of engine components is a sec-

ondary possibility for the cause of the engine failure should be excluded because it is overly speculative and conflicts with the evidence. The Court agrees. While Plaintiff is correct that an expert need not rule out every possible explanation for an accident in drawing a conclusion (*see* Pl.'s Resp. 11), such expert cannot merely float unsubstantiated additional potential causes of the accident. Mr. Sommer's opinion regarding secondary possibilities is pure speculation and is, thus, inadmissible. In his testimony, Mr. Sommer even admits that the evidence he reviewed does not support any of his purported secondary possibilities for causation. In short, this opinion is exactly the type of speculation that the Rules of Evidence attempt to preclude. As such, the Court finds that Mr. Sommer's opinion that, in terms of causation of the engine failure, a secondary possibility was a malfunction of engine components must be excluded.

*Plaintiff's Expert Arthur Lee Coffman*

Defendant Teledyne seeks to exclude four opinions proffered by Mr. Coffman: (1) that Mr. Coffman was "surprised" that Defendant Teledyne had conducted an installation audit and made no reference to the lack of insulation on the breather line; (2) that Mr. Coffman was "surprised" that Defendant Teledyne did not make any reference during the installation audit to the inclusion of an air/oil separator because he always felt that Defendant Teledyne did not recommend breather separators; (3) that Mr. Coffman was "surprised" to see a rubber hose being used as an oil breather line; and (4) that Mr. Coffman cannot rule out an oil leak having caused the accident. The Court shall consider each of these opinions in turn.

able methodology involving testing the different saw models, tightening and loosening the

knobs, and making conclusions based upon his observations. 556 F.Supp.2d at 177–78.

■ First, Defendant Teledyne contends that Mr. Coffman's opinion that he was "surprised" that Defendant Teledyne had conducted an installation audit and made no reference to the lack of insulation on the breather line is inadmissible. (Def.'s Mot. 12.) The Court agrees, for the same reasons it concluded that Mr. Sommer's very similar opinion should be excluded. (*See supra* p. 12.) While it may be supported by the facts on the record, this opinion can neither be said to be the product of any sort of methodology nor can it be said to assist the trier of fact, as it is a conclusion at which jurors could arrive on their own and requires no scientific or specialized knowledge. *See Hibiscus Assocs.*, 50 F.3d at 917. As such, the Court finds that Mr. Coffman's opinion expressing surprise that Defendant Teledyne did not advise Defendant Cirrus to insulate the breather line during the installation audit is excluded.[9]

Next, Defendant Teledyne argues that Mr. Coffman's opinion regarding the lack of reference during the installation audit to the inclusion of an air/oil separator is inadmissible because it is speculative and not based on facts in evidence. Plaintiff asserts that Mr. Coffman will not be offering such opinion at trial. Thus, the Court finds that such opinion should be excluded.

■ As for Mr. Coffman's opinion regarding the use of a rubber hose as a breather line, Defendant Teledyne argues that such opinion is irrelevant, given Mr. Coffman's concession that the use of a rubber hose instead of an aluminum tube "probably [did] not" contribute to the accident. (Def.'s Mot. 16.) The Court agrees. While, as Plaintiff contends, Mr. Coffman might be qualified to render an opinion regarding the industry standard for breather lines, Mr. Coffman stated during his testimony that he does not believe that the choice of rubber tubing for the breather line contributed to the accident or that any of the problems commonly associated with rubber tubes occurred here.[10] Additionally, although this opinion might be slightly probative of Defendant's Cirrus's lack of expertise as an airframe manufacturer, the Court finds that such testimony would be unduly prejudicial. *See* Fed. R.Evid. 403. As such, the Court finds that Mr. Coffman's opinion regarding the choice of rubber hosing for the breather line should be excluded.

■ Finally, Defendant Teledyne contends that Mr. Coffman's opinion that an oil leak cannot be ruled out should be excluded because it is too speculative and not based on any facts in evidence. Much like Mr. Sommer's opinion regarding secondary possibilities (*supra* pp. 12–13), this opinion is pure speculation. Mr. Sommer's conclusion that the accident was caused by the freezing of the breather line may very

9. Because the Court is excluding Mr. Coffman's opinion, it has no reason to reach Defendant Teledyne's alternative argument that Mr. Coffman's opinion should be excluded because Mr. Coffman is not qualified to give expert testimony as to what an engine manufacturer should communicate to an airframe manufacturer during an installation audit.

10. The Court notes the following exchange during Mr. Coffman's deposition:

Q: Mr. Coffman, is the fact that this was a rubber hose, did that cause or contribute to what you believe occurred in this accident?
A: Probably not. I think [the] extremely cold temperature of an uninsulated breather line or tube as we want to call this here is the factor.
Q: So you're not going to testify that you thought it changed shape or drooped or deteriorated?
A: No, I am not.
(Coffman Dep. 183:22–184:5.)

well have been the product of a reliable methodology, his opinion that an oil leak cannot be ruled out does not appear to have been reached by way of a reliable process or methodology. To the contrary, Mr. Coffman is merely proposing another hypothesis—one that he concedes is unlikely—because, as he seems to intimate, "anything's possible." As such, because it is the product of unreasoned speculation, Mr. Coffman's opinion regarding the possibility that an oil leak caused the accident must be excluded.

Accordingly, it is

ORDERED AND ADJUDGED that the Motion (D.E. 101) is GRANTED in accordance with this Order.