NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0349n.06

No. 24-5797

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jul 16, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| JOSEPH HILL and TRACY HILL, | ) | |
| Plaintiffs-Appellants, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| v. | ) ) | |
| MEDICAL DEVICE BUSINESS SERVICES, INC., | ) ) | |
| Defendant-Appellee. | ) ) ) | OPINION |

Before: CLAY, THAPAR, and READLER, Circuit Judges.

**CLAY, Circuit Judge.** Plaintiffs Joseph and Tracy Hill appeal the district court's grant of summary judgment to Defendant Medical Device Business Services, Inc., as well as the district court's decision to exclude the testimony of Plaintiffs' expert witnesses, in this products liability action under the Tennessee Products Liability Act. *See* Tenn. Code. Ann. § 29-28-102. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Factual History

On August 14, 2014, Joseph Hill underwent a total hip arthroplasty (also referred to as "hip replacement surgery") on his right hip. Order, R. 84. Page ID #4397. Mr. Hill's surgeon, Dr. William Kurtz, implanted a CORAIL® femoral stem ("the Implant" or "femoral stem") into his femur that was manufactured by Medical Device Business Services, Inc. ("MDBS"). The Implant was "one of multiple modular components that fit together to form a 'total hip replacement'"

during Mr. Hill's surgery. *Id.* (citation omitted). At the time of implantation, Dr. Kurtz was aware that the Implant ran the risk of developing a condition known as "fatigue fracture of the femoral stem," which was also noted as a possible complication in MDBS's product warnings. Exhibit A, Femoral Stem Warning, R. 55-1, Page ID #8.

Following his hip surgery, Mr. Hill experienced pain in his groin and thigh area and decided to obtain a second opinion from Dr. Brian Perkinson, a different orthopedic surgeon. Dr. Perkinson concluded that Mr. Hill had a "leg length discrepancy" and "offset deficiency" of about 10 mm. Order, R. 84. Page ID #4398. On September 4, 2015, Dr. Perkinson performed a right-hip revision surgery on Mr. Hill, during which he kept the Implant in place but swapped out two of its modular components to correct the imbalance. Mr. Hill's condition temporarily improved after this revision surgery, but he continued to experience pain through June 2020.

On June 9, 2020, Mr. Hill was walking in the park with his wife, Tracy Hill, when he suddenly collapsed in pain. He was taken to the hospital and diagnosed with "a fracture of his Implant" at the femoral stem. *Id.* at Page ID #4399. On June 12, 2020, Dr. Perkinson performed a second revision surgery where he removed and replaced the entire hip replacement construct, including the Implant.

## B. Procedural History

On June 7, 2021, Plaintiffs Joseph and Tracy Hill filed this lawsuit against Defendant MDBS raising several products-liability claims under Tennessee law with respect to the Implant's design and manufacturing.[1] Plaintiffs' claim is governed by the Tennessee Products Liability Act ("TPLA"), which requires them to establish that: "(1) the product was defective and/or

---

[1] In Plaintiffs' complaint, they alleged that the Implant had either a design defect or a manufacturing defect, but they later abandoned their design-defect theory at summary judgment and now rely exclusively on their manufacturing-defect theory.

unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer's control, and (3) the plaintiff's injury was proximately caused by the defective product." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citation omitted).

Both parties retained and disclosed expert witnesses who appeared to agree that the Implant failed because of "a small flaw in the Implant's metal," but disagreed on the cause of that defect. Order, R. 84. Page ID #4399. Defendant's experts claimed that the flaw was introduced to the Implant during surgery "from the use of electrocautery" and could not have been discovered by the surgeons or MDBS at the time of Mr. Hill's procedure, whereas Plaintiffs' experts claimed that the flaw was introduced earlier, during MDBS's manufacturing process. *Id.* at Page ID #4399–4400.

Plaintiffs retained three experts to opine on the Implant's failure: Dr. Brian Dierckman (an orthopedic surgeon), Dr. Julia Greer (a metallurgy engineer), and Dr. David Merryman (a biomedical engineer). These experts proceeded to rule out alternative explanations for a flaw in the Implant to support Plaintiffs' position that the defect must have occurred during the manufacturing process. Specifically, Dr. Dierckman found that surgical error probably did not cause the Implant's failure because the surgery was performed competently, Mr. Hill was a good candidate for the surgery, and his weight and activity levels were both within a normal range and would be unlikely to overload the Implant.

Dr. Greer performed various engineering calculations to identify a "critical flaw" in the Implant due to the presence of "two very small holes (micropores) located very near one another that—considered collectively and in light of their proximity to one another—weakened the material so as to make it susceptible to fatigue failure." Order, R. 84, Page ID #4407. Dr. Greer concluded that "nothing done in either the 2014 [or] 2015 surgeries caused any critical defect to

the device to cause its failure." Greer Report, R. 51-2, Page ID #1295. Rather, she asserted that "[s]uch a critical flaw would most likely be introduced during the manufacturing process." *Id.* at Page ID #1296. She proceeded to rule out other explanations for the micropores, including corrosion and anything attributed to Mr. Hill's surgeries.

Although Dr. Merryman did not "microscopically evaluate" the Implant, he reviewed Dr. Greer's findings and agreed with her conclusion that Mr. Hill's surgeries did not cause the critical flaw. Merryman Report, R. 54-3, Page ID #1810. Dr. Merryman wrote: "Assuming that [the Implant's] microscopic critical flaw was present on [Dr. Greer's] evaluation (as the images and her report show) and was introduced at some point during the manufacturing process (as the evidence suggests), I agree that it would be a likely contributing factor to the [Implant's] failure." *Id.* Plaintiffs did not present any expert testimony related to MDBS's manufacturing process for the Implant.

On November 4, 2022, Plaintiffs filed a motion in limine to exclude evidence that Mr. Hill's surgeons were responsible for the Implant's failure, invoking the state-law pleading requirements of *George v. Alexander*. 931 S.W.2d 517, 518 (Tenn. 1996). Subsequently, Defendant MDBS filed separate motions in limine to exclude the expert testimony of Dr. Greer and Dr. Merryman under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). MDBS argued that Dr. Greer was unqualified to rule out alternative explanations for the micropores because she was "not an expert on, and lack[ed] any experience with, hip implants." Def.'s Mot. to Exclude Testimony, R. 51, Page ID #1194. It alleged that Dr. Greer was unfamiliar with MDBS's manufacturing process, and the design and manufacture of total hip replacement products generally, and thus used an unreliable methodology.

Defendant also argued that Dr. Merryman "parroted Dr. Greer's (unreliable) opinion on the cause of the micropores without performing his own microscopic examination of the femoral stem." Appellee Br., ECF No. 27, 13. Furthermore, Defendant contended that neither Dr. Greer nor Dr. Merryman were qualified to speak on medical causation since neither of them had ever attended a total hip replacement surgery or read an operative report from such a surgery; neither of them had any familiarity with the proper angles of implantation or assembly of the Implant; and neither of them "could name any of the instruments used during the surgery." Def.'s Mot. for Summ. J., R. 56, Page ID #2179–80.

On January 24, 2023, Defendant also filed a motion for summary judgment, claiming that Plaintiffs lacked sufficient evidence for a jury to trace a defect in the femoral stem to MDBS's manufacturing process. Plaintiffs filed a motion in opposition to Defendant's motion for summary judgment, arguing that their expert witnesses had put forth enough evidence for a jury to conclude that the product was defective or unreasonably dangerous, and that Defendant relied on "no evidence" to show that "the defect occurred after it left Defendant's control." Pls.' Mot. in Opp. to Def.'s Mot. for Summ. J., R. 66, Page ID #2757.

On August 7, 2024, the district court granted Defendant's motion for summary judgment and excluded the expert testimony of Dr. Greer and Dr. Merryman. With respect to Dr. Greer, the district court wrote that her "conclusions that the [Implant's] failure resulted from the Critical Flaw [due to micropores], and that the [micropores were] introduced during the manufacturing process, are based on ruling out all other potential causes of failure. But it is far from clear how Dr. Greer could rule out the other potential causes that she considered," namely, Mr. Hill's surgeries. Order, R. 84, Page ID #4410. The district court reasoned that Dr. Greer's lack of knowledge regarding the alternative causes of defect also went toward the reliability of her methods because the court

could not "determine whether her methodology was reliable without considering her knowledge (or lack thereof) of these factors." *Id.* at Page ID #4411–12. The district court also found that Dr. Greer had no direct evidence linking the micropores to MDBS's manufacturing process. Thus, the district court concluded that although Dr. Greer was "qualified to opine on the quality (such as durability and resilience) of the metal and on the extent to which the metal could fracture due to the presence of flaws," her ultimate opinion was "based in part on the biomechanics of the Implant (load and angle) and relie[d] on ruling out other possible external causes like surgery and biomechanics—all of which are matters outside her area of expertise." *Id.* at Page ID #4416.

The district court next concluded that Dr. Merryman's report misconstrued Dr. Greer's report as "describ[ing] a critical flaw in the manufacturing process," as opposed to a flaw in the metal itself, which alone "doom[ed] his prospects of showing . . . that his opinion [was] reliable." *Id.* at Page ID #4417–18. The district court also found that Dr. Merryman simply parroted Dr. Greer's opinion, without contributing any findings of his own.

The district court proceeded to explain its grant of summary judgment in favor of Defendant MDBS. Under the TPLA, the district court stated that Plaintiffs failed to prove three things, including that: (1) the product was unreasonably dangerous or in a defective condition, (2) the product was unreasonably dangerous under either the consumer-expectations test or the prudent-manufacturer test, and that (3) the product was unreasonably dangerous when it left MDBS's control. Because Plaintiffs' experts failed to identify anything wrong in the manufacturing process, the district court determined that there was insufficient evidence for a jury to infer the presence of a manufacturing defect.

The district court also rejected Plaintiffs' alleged malfunction-theory, reasoning that "when a device is known to fail for unknown reasons, it is pure speculation that a failure is attributable to

a manufacturing defect and not some other unknown cause without evidence supporting one cause over another." *Id.* at Page ID #4431. Finally, the district court explained that Plaintiffs' claim could not succeed under the TPLA's unreasonably dangerous prong because it did not satisfy either the consumer-expectations or prudent-manufacturer tests. This appeal followed.

## II. DISCUSSION

### A. EXCLUSION OF EXPERT TESTIMONY

We review the district court's decision "to exclude the testimony of plaintiffs' expert witnesses for an abuse of discretion, even when that decision results in the entry of summary judgment." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248 (6th Cir. 2001). A district court abuses its discretion when it bases its ruling "on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

Plaintiffs Mr. and Mrs. Hill argue that the district court abused its discretion by excluding the testimony of their two expert witnesses: Dr. Greer, a metallurgist, and Dr. Merryman, a biomedical engineer. The Hills state that Dr. Greer satisfied the five *Daubert* factors in identifying a manufacturing defect in Defendant's hip implant and was not required to "conclusively negate other possible causes of [its] failure." Appellants' Br., ECF No. 20, 23. The Hills also allege that Dr. Greer relied on the expert opinion of Dr. Dierckman, an orthopedic surgeon, in formulating her analysis and eliminating alternative causes. Further, because of the purported reliability of Dr. Greer's opinion, the Hills contend that Dr. Merryman was entitled to rely on her opinion in reaching his own "independent conclusions," which the district court improperly excluded. *Id.* at 28.

Defendant MDBS responds that the district court properly excluded the testimony of both experts, because Dr. Greer, an engineer with no familiarity with MDBS's hip-implant manufacturing process, "rested her opinion entirely on the elimination of alternative explanations for the micropores [in the hip implant]" and lacked the independent qualifications to do so. Appellee Br., ECF No. 27, 30. Because Dr. Greer did not support her conclusions with any qualified expert report, MDBS deems her testimony "unreliable." *Id.* at 36. On this point, MDBS refutes Plaintiffs' claim that Dr. Greer relied on Dr. Dierckman's report because "Dr. Greer admitted under oath that she in fact did not rely on [it]." *Id.* at 37. Consequently, MDBS states that Dr. Merryman's testimony was properly excluded "to the extent it relied on Dr. Greer's report." *Id.* at 42. We agree that the district court did not abuse its discretion by excluding the testimony of these expert witnesses.

Under Federal Rule of Evidence 702, district courts perform a "gatekeeping role" to ensure that "an expert's testimony both rests on a reliable foundation and is relevant." *In re Onglyza (Saxagliptin) and Kombiglyze (Saxagliptin and Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024) (quoting *Daubert*, 509 U.S. at 597). This expert testimony must be based on: (1) "specialized knowledge" that is helpful to the trier of fact, (2) "sufficient facts or data," (3) "reliable principles and methods," and (4) "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Stevens v. Keller Ladders*, 1 F. App'x 452, 458 (6th Cir. 2001) (explaining that expert testimony may be required when "the question is of a complex and technical nature such that a lay juror could not, without the aid of the expert, infer that a defective condition . . . caused the product's failure")).

As gatekeeper, the district court must examine whether an expert's qualifications "provide a foundation for [them] to answer a specific question," rather than simply assessing their

qualifications "in the abstract." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Still, the district court enjoys considerable "discretion in determining whether or not a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). The district court need not admit expert testimony "that is connected to existing data only by the *ipse dixit* of the expert," or where there is "too great an analytical gap between the data and the opinion proffered." *Nelson*, 243 F.3d at 254 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Because this inquiry is often fact-driven, the district court's gatekeeping role is "very flexible," and commands a high degree of deference by the reviewing court. *Johnson*, 484 F.3d at 430.

### 1. Dr. Greer's Testimony

It is well-known that expert witnesses, though qualified in one area, may not testify beyond their specific expertise. *See Daubert*, 509 U.S. at 589–91. In the factually similar case *Botnick v. Zimmer,* the plaintiff retained a mechanical engineer to testify on the alleged cause of a fractured medical device that had been surgically implanted into his femur. 484 F. Supp. 2d 715, 718 (N.D. Ohio 2007). The Northern District of Ohio excluded this testimony because the expert's "general engineering expertise" was "less than particular to the science involved in the case." *Id.* at 719–20 (citing *Krueger v. Johnson and Johnson Pro., Inc.*, 160 F. Supp. 2d 1026, 1031 (S.D. Iowa 2001)); *see Jaske v. Zimmer, Inc.*, No. 03-C-2939, 2010 WL 345897, at *4 (N.D. Ill. Jan. 26, 2010) (excluding expert testimony from a metallurgist regarding the fatigue fracture of a knee implant because he "lack[ed] any expertise in the biomechanics of the knee, or, the specific circumstances to which the metal was exposed").

In the present matter, Dr. Greer is patently qualified as a metallurgist to testify that "all metals have scattered flaws and that a critical flaw could cause a metal to crack and fail," among other observations about the metal itself. Order, R. 84, Page ID #4410. But despite her impressive credentials in metallurgy, the district court found that her lack of medical and surgical expertise was "undisputed" in the record. *Id.* at Page ID #4409. In particular, Dr. Greer had never: (1) attended a total hip replacement surgery, (2) performed a failure analysis on a total hip implant, or (3) read an operative report from such a surgery prior to her role in this matter, and was also unfamiliar with (4) the proper angles of hip implantation, (5) MDBS's hip implant assembly and manufacturing process, and (6) the instruments used during hip surgery.

Judging from Dr. Greer's report, we are supposed to infer that the Implant's "critical flaw" arose "during the manufacturing process," Greer Report, R. 51-2, at #1296, but Dr. Greer was admittedly unfamiliar with MDBS's manufacturing process and "did not examine [it] as part of [her] analysis." Greer Dep., R. 65-2, Page ID #2483. She then purported to rule out the possibility that the Implant's defect was introduced during Mr. Hill's "2014 and 2015 surgeries," or at any other time "after the original placement," but it is unclear how she reached this conclusion without any medical training or knowledge of the hip procedure in question. Greer Report, R. 51-2, Page ID #1295–96. As the district court observed, Dr. Greer purported to rule out the possibility that the femoral stem was placed at an improper angle during surgery, but did "not know the proper angle at which the Implant should have been placed." Order, R. 84, at Page ID #4411. She also attempted to rule out trauma or blunt force, but "did not know anything about how the surgery was conducted." *Id.*

The Hills cite *Eimers v. Lindsay Corp.* for their argument that Dr. Greer was not required to rule out every possible cause of the Implant's failure. No. 1:19-cv-44, 2021 WL 5647993, at

*48–49 (E.D. Tenn. Dec. 1, 2021), *rev'd in part on reconsideration*, No. 1:19-cv-44, 2022 WL 1721451 (E.D. Tenn. May 27, 2022)). While true that an expert witness need not testify with perfect certainty, they must still draw their conclusions from a reliable methodology and "Dr. Greer ha[d] no basis for her rejection of alternative explanations for the [Implant's] micropores." Appellee Br., ECF No. 27, 34. Indeed, Dr. Greer's report appears to follow a process-of-elimination method to conclude that MDBS's manufacturing process caused the Implant's critical flaw, since she lists several "ruled out" possible causes of a critical flaw before summarizing her opinions in the case. Greer Report, R. 51-2, Page ID #1295. But without any medical training or familiarity with the instruments used during Mr. Hill's surgeries, among other informational gaps, Dr. Greer could not reliably conclude that "nothing done in either the 2014 [or] 2015 surgeries caused any critical defect to the device." *Id.* She also offers no explanation for this logical leap aside from her supposed reliance on the opinion of Dr. Dierckman, the Hill's expert in orthopedic surgery. *Joiner*, 522 U.S. at 146.

To that end, the Hills argue that Dr. Greer's report is saved by her reliance on Dr. Dierckman's opinion, which "informed and contributed to her own independent analysis" in such a manner that she could eliminate all surgical causes for the Implant's critical flaw. Appellants' Br., ECF No. 20, 25. This argument is refuted by Dr. Greer's own statements. In her deposition transcript, Dr. Greer explicitly stated that she *did not* rely on Dr. Dierckman's opinion. She explained that Dr. Dierckman's opinion "didn't serve in any capacity to generate [her] report." Greer Dep., R. 65-2, Page ID #2608. Then, when asked if it was "fair to say" that she "did not rely on Dr. Dierckman's report in any meaningful way," Dr. Greer responded in the affirmative. *Id.* She further acknowledged her unfamiliarity with Dr. Dierckman's analysis at the time of

writing her report, and that she was "sort of taking [the attorney's statements] at face value." *Id.* at Page ID #2694.

This testimony directly contradicts Dr. Greer's report, which states: "I have reviewed the report of Dr. Brian Dierckman, and also rely on his opinion that the surgeries did not cause any defect in the stem." Greer Report, R. 51-2, Page ID #1295. Understandably, the district court was "disconcerted" by this contradictory statement and its inclusion in Dr. Greer's report. Order, R. 84, Page ID #4410 n.13. It appears that the Hills attempted to correct this issue by having Dr. Greer submit a supplemental declaration on February 24, 2023, nearly six months past the scheduling deadline for Plaintiffs to submit expert reports (September 1, 2022), in which she reaffirmed her partial reliance on Dr. Dierckman's conclusions. But district courts have "broad discretion to exclude untimely disclosed expert-witness testimony." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). Further, supplementation should not be used "to bolster or submit additional expert opinions." *Bowles v. City of Mansfield*, No. 1:07CV2276, 2008 WL 11480485, at *2 (N.D. Ohio Nov. 21, 2008) (quoting *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D. N.C. 2002)). Accordingly, the district court did not abuse its discretion by excluding the expert testimony of Dr. Greer.

### 2. Dr. Merryman

The district court also did not abuse its discretion by excluding Dr. Merryman's testimony, after concluding that he relied entirely on Dr. Greer's report and mischaracterized her conclusions. In particular, Dr. Merryman stated that Dr. Greer's report "describes a 'critical flaw' in the manufacturing process that created a defect in the device." Merryman Report, R. 54-3, Page ID #1810. But Dr. Greer's use of the term "critical flaw" appears to relate to a flaw in the metal itself, not the *manufacturing process*. *See* Greer Rep., R. 51-2, Page ID #1295–96 (referring to

"micropore defects on the implant"). She very plainly did not identify a "critical flaw" in MDBS's manufacturing process, and seemingly had no negative opinion on their processes because she "did not examine [them] as part of [her] analysis." Greer Dep., R. 65-2, Page ID #2483. As the district court expressed, this mischaracterization alone was sufficient to "doom" the reliability of Dr. Merryman's report. Order, R. 84, Page ID #4418.

Even so, the district court found it significant that Dr. Merryman's report did not add any new information regarding the Implant's alleged critical flaw or MDBS's manufacturing process. This is understandable since Dr. Merryman "did not microscopically evaluate the device . . . and [had] to defer to [Dr. Greer] . . . on that finding of the microscopic critical flaw." Merryman Report, R. 54-3, Page ID #1810 (noting that Dr. Merryman conducted a "gross evaluation"). Although experts may generally rely on other expert reports, they must still conduct some amount of independent analysis and cannot "merely regurgitate another expert's opinion." *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 844 (N.D. Ohio 2011) (quoting *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009)). Because Dr. Merryman largely regurgitated Dr. Greer's findings (which were also excluded) and did not contribute any helpful information of his own, the district court did not abuse its discretion by excluding his testimony.

## B. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Hills also argue that summary judgment was improper because of "direct and circumstantial proof" of a manufacturing defect in the Implant that caused Mr. Hill's injury. Appellants' Br., ECF No. 20, 28. They attempt to rely on both the consumer expectation and prudent manufacturer tests, stating that "[t]he fact that neither the surgeon nor the patient would expect the implant to fail under normal use is sufficient to create a question of fact on whether the device was unreasonably dangerous," and that "a prudent manufacturer would not put an implant

with a critical flaw into commerce," respectively. *Id.* at 31. The Hills cite the testimony of Dr. Greer and other witnesses in asserting that a reasonable juror could conclude that the defect arose during the manufacturing process. The Hills also argue that they presented sufficient evidence to "proceed under the quasi-*res ipsa* 'malfunction theory.'" *Id.* at 37 (citation omitted). Defendant MDBS responds that Plaintiffs did not establish that the Implant was defective or unreasonably dangerous.

We review a district court's grant of summary judgment *de novo* and draw all reasonable inferences in favor of the non-moving party. *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056 (6th Cir. 2024) (citing *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. Educ.*, 1 F.4th 436, 445 (6th Cir. 2021)). While "[t]he moving party bears the burden of showing the absence of any genuine issues of material fact," the non-moving party must still present meaningful evidence to the contrary. *Sigler*, 532 F.3d at 483 (citing *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000)).

To establish a products-liability claim in Tennessee under the TPLA, "the plaintiff must show: (1) the product was defective and/or unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer's control, and (3) the plaintiff's injury was proximately caused by the defective product." *Sigler*, 532 F.3d at 483 (citation omitted). Because the parties do not contest the third element, we address the first two elements only.

### 1. Defective or Unreasonably Dangerous

The first element of a TPLA claim may be satisfied when a plaintiff demonstrates that "a product was defective or unreasonably dangerous through direct evidence, circumstantial evidence, or a combination." *Id.* The TPLA defines a "defective condition"[2] as "a condition of a

---

[2] On appeal, MDBS asserts that the Hills "failed to challenge the district court's defective-condition determination in their opening brief," and thus forfeited the argument. Appellee Br., ECF No. 27, 46. While true that the Hills do not explore this argument in great detail and appear

product that renders it unsafe for normal or anticipatable handling and consumption." *Fulton v. Pfizer Hosp. Prods. Grp., Inc.*, 872 S.W.2d 908, 911 (Tenn. Ct. App. 1993) (quoting Tenn. Code. Ann. § 29-28-102(2)). That said, the product need not be "perfect, accident-proof, or incapable of causing injury." *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 282 (Tenn. 2005). "[A]n injury of itself is not proof of a defect and thereby raises no presumption of defectiveness." *Fulton*, 872 S.W.2d at 911. Given the Hill's assertions of a manufacturing-defect, as opposed to a design-defect, they must "trace [Mr. Hill's] injury to some specific error in construction . . . of the [product.]" *Id.* at 912 (quoting *Browder v. Pettigrew*, 541 S.W.2d 402, 404 (Tenn. 1976)).

The circumstantial evidence does not show this, since the Hill's experts did not "identify anything wrong in the manufacturing process." Order, R. 84, Page ID #4425. Although Dr. Greer theorized that such a defect "would most likely be introduced during the manufacturing process," Greer Report, R. 51-2, Page ID #1296, she could not tell "one way or another, . . . whether there was a particular process in the manufacturing steps that [MDBS] followed to make the implant" that caused it to fail. Greer Dep., R. 65-2, Page ID #2458. She also gave no opinion "on the specific ways in which [MDBS's] manufacturing process should be changed or improved to eliminate the possibility of micropores," *id.* at Page ID #2480, which she admitted were present in "every metal," *id.* at Page ID #2460, and did not know what an ideal manufacturing process would look like. In fact, Dr. Greer not only disclaimed any intent to criticize MDBS's manufacturing process, but she went so far as to praise it, stating that MDBS would "do everything . . . to create

---

to somewhat conflate the quality of a defective product with one that is unreasonably dangerous, we find that they address the issue in more than "a perfunctory manner." *Bard v. Brown County*, 970 F.3d 738, 750 (6th Cir. 2020) (quoting *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013)); *see* Appellants' Br., ECF No. 20, 29 (reflecting Plaintiffs' discussion on Dr. Greer's ability to testify to a "defective condition" in the Implant under element one of the TPLA).

the strongest, most reliable, most beneficial-to-the-patient product," and that their "manufacturing process . . . [was] worked out fully" and even "state-of-the-art." *Id.* at Page ID #2481.

Furthermore, Dr. Greer acknowledged the inevitability of "microscopic defects in any manufacturing process." *Id.* at Page ID #2495. She explained that all metals have "a statistical distribution of flaws" and "pores" that "can serve as a stress concentration and a crack-initiation site," *id.* at Page ID #2460, and "may or may not lead to fatigue failure" as Mr. Hill experienced. *Id.* at Page ID #2486. Dr. Merryman agreed with this view, stating that "[t]here are stems or necks that fail every year that are idiopathic, we don't understand exactly why they failed." Merryman Dep., R. 64-1, Page ID #2269. In consideration of the above, we find no direct or circumstantial evidence tracing Mr. Hill's injury "to any specific error in *construction* . . . of the product." *Fulton*, 872 S.W.2d at 912 (emphasis added).

Relatedly, the Hills cannot establish a defect through their alleged "malfunction theory." Appellants' Br., ECF No. 20, 34. This doctrine, which "allows plaintiffs . . . to infer defectiveness from the negation of other causes," cannot be reasonably applied when the Hills furnish no specific circumstantial evidence that the critical flaw resulted from a defect in MDBS's manufacturing process as opposed to other causes. *Hill v. Kia Motors Am., Inc.*, No. 20-5690, 2022 WL 557823, at *9 (6th Cir. Feb. 24, 2022) (citing *Balducci v. Hyundai Motor Am., Inc.*, 406 F. App'x 517, 518 (2d Cir. 2011)). While the Hills were not required to negate every possible cause of the Implant's defect, their own experts, Dr. Greer and Dr. Merryman, stated that all metals contain unavoidable flaws capable of causing a breakage and that such medical devices can fail for unknown reasons. In light of this testimony, it remains unclear why a manufacturing defect would be the likeliest culprit of Mr. Hill's injury, especially when "fatigue fracture of the femoral stem" was a known risk factor of his surgery. Femoral Stem Warnings, R. 55-1, Page ID #8.

The Implant was also not unreasonably dangerous. In Tennessee, the TPLA provides that Plaintiffs may prove that a product was unreasonably dangerous using either the consumer-expectations test or the prudent-manufacturer test. *Sigler*, 532 F.3d at 483–84. Under the consumer-expectations test, the TPLA defines "unreasonably dangerous" to mean "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Tenn. Code § 29-28-102(8). The Hills attempt to meet this standard by citing the testimony of Dr. Dierckman and Mr. Hill that they personally did not expect the Implant to fail under normal usage; but that is not the test. Instead, we ask whether an *ordinary consumer* with *ordinary knowledge* would have certain safety expectations about the Implant's performance and risk of fatigue fracture. *Id.* But the Hills have presented no evidence whatsoever of the ordinary consumer's mindset regarding the Implant, which defeats their consumer-expectations theory. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 533 (6th Cir. 2012); *Young v. Olympus Am., Inc.*, No. 07-2547-STA, 2012 WL 252645, at *5 (W.D. Tenn. Jan. 26, 2012) (declining to apply the consumer-expectations test when the plaintiffs put forth "no evidence that an ordinary consumer would have an expectation about the performance of the [medical device] at issue").

The Hills also cannot satisfy Tennessee's prudent-manufacturer test, despite its general applicability "to more complex products" such as medical devices, because they furnish no evidence on MDBS's manufacturing process or decision to market the Implant. *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 968 (M.D. Tenn. 2002). In the prudent-manufacturer context, the statute defines "unreasonably dangerous" to mean a product that "would not be put on the market by a reasonably prudent manufacturer . . . assuming that the manufacturer . . . knew of its dangerous condition." Tenn. Code. § 29-28-102(8). Unlike the consumer-expectations test, expert testimony

is "essential" to meet the prudent-manufacturer test and must focus on "the prudence of the [manufacturer's] decision" to market the product. *Ray by Holman v. BIC Corp.*, 925 S.W.2d 527, 531 (Tenn. 1996); *see Irion v. Sun Lighting, Inc.*, No. M2002-00766-COA-R3-CV, 2004 WL 746823, at *13 (Tenn. Ct. App. Apr. 7, 2004) ("In determining whether a product was defective or unreasonably dangerous, the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers . . . of similar products at the time of manufacture . . . must be considered." (citing Tenn. Code. Ann. § 29-28-105(a)).

The Hills present no such testimony, and simply assert that circumstantial proof linked the Implant's critical flaw to the manufacturing process. Critically, they have not introduced any expert testimony that MDBS "deviated from acceptable standards of quality or conduct in the industry." *Shoemake v. Omniquip Int'l, Inc.*, 152 S.W.3d 567, 573 (Tenn. Ct. App. 2003) (finding no proof that a product was unreasonably dangerous when the plaintiffs only offered "suggestions" but presented "no proof" that the manufacturer failed to follow proper procedures). The Hill's own expert, Dr. Greer, described MDBS's manufacturing process as "state-of-the-art." Greer Dep., R. 65-2, Page ID #2481. Dr. Greer also could not identify "a particular process in the manufacturing steps . . . that led to [the Implant's] failure," acknowledged that "every metal" contains unpreventable flaws, and was admittedly unfamiliar with the "customary standards or techniques" used in the manufacture of hip implants. *Id.* at Page ID #2458–60, 2475. Importantly, Dr. Greer also acknowledged that "every manufacturing process has a chance of containing one or more defects." *Id.* at Page ID #2483. The aggregate of this testimony refutes the Hill's claim that MDBS failed to act reasonably, and the record is similarly devoid of any evidence of wrongdoing. Therefore, the Hill's claim that the Implant was unreasonably dangerous must fail.

### 2. Defect Under MDBS's Control

Because the Hills have not presented evidence sufficient to withstand summary judgment under the first element of their TPLA claim, they also cannot prove that the Implant was defective or unreasonably dangerous "at the time it left the control of [MDBS]." Tenn. Code. Ann. § 29-28-105(a). For this independently sufficient reason, we affirm the district court's grant of summary judgment to MDBS.

### C. PLAINTIFFS' MOTION IN LIMINE

Finally, the Hills argue that the district court should have granted their motion in limine to exclude Defendant's evidence that Mr. Hill's surgeons caused the Implant to fail. They assert that "Tennessee law requires that if the defendant intends to "shift the blame" to a non-party . . . the defendant must plead that defense." Appellants' Br., ECF No. 20, 39 (quoting *Crotty v. Flora*, 676 S.W.3d 589, 604–05 (Tenn. 2023)). Because Defendant MDBS "did not plead the non-party causation defense," the Hills argue that their evidence of surgical wrongdoing should be suppressed. *Id.* MDBS responds that the Hills "forfeited any argument that the motion in limine should be applied to the summary judgment proceedings," by failing to incorporate arguments from the motion in limine into their summary judgment briefing. Appellee Br., ECF No. 27, 57. They further argue that the Hill's motion in limine is irrelevant and would have no bearing on the admissibility of other expert testimony. Finally, they argue that the Hill's motion "improperly seeks to impose state-law procedural rules onto a federal-court proceeding." *Id.* at 59. We find that the district court did not abuse its discretion by denying Plaintiffs' motion in limine.

"We review a district court's ruling on a motion in limine for an abuse of discretion." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 560 (6th Cir. 2013) (quoting *Branham v. Thomas M. Cooley L. Sch.*, 689 F.3d 558, 562 (6th Cir. 2012)). An abuse of discretion only occurs if the district

court "relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.* (quoting *Miller v. Countrywide Bank, N.A.*, 708 F.3d 704, 707 (6th Cir. 2013)).

In advance of trial, motions in limine are designed "to exclude anticipated prejudicial evidence before the evidence is actually offered." *Louzon*, 718 F.3d at 561 (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). Federal district courts may exclude evidence in limine pursuant to their "inherent authority to manage the course of trials." *Luce*, 469 U.S. at 41 n.4. Denial of a motion in limine does not mean that the corresponding evidence will necessarily be admitted at trial. *See id.*; *see also Hunter v. Blair*, 120 F.R.D. 667, 667 (S.D. Ohio 1987) (order) (noting that the district court may, in its discretion, "decline to make a pretrial ruling").

Because the district court did not err by granting summary judgment for MDBS, it also did not abuse its discretion in denying Plaintiffs' motion in limine as moot. The Hills argue that, had the district court granted their motion in limine to exclude evidence of a surgical cause of the micropores, "there would be no need for Dr. Greer to eliminate [the surgeries] as a possible cause" of the Implant's critical flaw. Appellants' Br., ECF No. 20, 40. This argument erroneously assumes that the testimony of one expert can somehow alleviate another expert's duties under Rule 702. To the contrary, "the trial judge must ensure that *any and all* scientific testimony or evidence admitted is not only relevant, but *reliable*." *Daubert*, 509 U.S. at 589 (emphasis added).

In the present matter, Dr. Greer utilized a process of elimination technique to opine on the cause of the micropores but was unqualified to do so given her lack of surgical knowledge, discussed *supra*, and her admitted lack of reliance on the opinion of Dr. Dierckman or any other medical expert. It makes no difference whether MDBS's experts were excluded because the Hills cannot escape *Daubert*'s requirement to ensure the reliability of their own expert witnesses. *See*

*id.* Furthermore, the Hills cannot satisfy either the consumer-expectations test or the prudent-manufacturer test under Tennessee law, and likewise present no evidence to suggest that the Implant was defective or unreasonably dangerous when it left MDBS's control. Thus, because the district court's exclusion of MDBS's evidence would not have changed the Hill's evidentiary obligations under Rule 702, and because the Hills would still lose on summary judgment, their motion in limine is moot.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.